(34 Misc. Rep. 133.)

MARKELL et al. v. HILL et al.

(Supreme Court, Special Term, Onondaga County. February, 1901.)

1. ASSIGNMENT FOR BENEFIT OF CREDITORS—FRAUDULENT JUDGMENT—ACTION TO SET ASIDE.

A judgment creditor of an estate which has been assigned for the benefit of creditors may sue to set aside a fraudulent judgment, where the complaint alleges that the assignee refuses to sue after demand, or is a party to the fraud.

2. SAME—POWERS OF ASSIGNEE.

A general assignee for creditors in an action against the estate may either compromise the claim, or answer and admit the truth of such allegations as he knows to be correct.

3. SAME.

Where a guardian of infants dies insolvent and indebted to their estates, and his surviving partner makes a general assignment of the assets of the firm to one who is a surety on the guardian's bond, and the assignee receives moneys of the infants, and permits judgment to be recovered against himself therefor by the administrators of the guardian, after admission of the allegations of their complaint and a trial, judgment creditors of the firm to which the guardian belonged can sue to set the judgment aside, though there has been no actual fraud, as the general assignee has allowed a recovery of the judgment against him, which reduced the fund belonging to the estate, and relieves such assignee of his liability as surety for the guardian.

4. SAME—REMOVAL OF ASSIGNEE.
     An assignee for the benefit of creditors will not be removed at the suit
     of creditors because he suffered judgment on a valid claim against the
     estate, where no fraud or fraudulent intent was shown.

Action by James Markell and others against D. Munro Hill and others to set aside a judgment in favor of the plaintiffs entered in an action by C. J. Rodger and A. D. Lewis, administrators, against D. Munro Hill. Judgment for plaintiffs.

Lewis & Crowley, for plaintiffs.

Homer & Waldo Weston, for defendants.

ANDREWS, J. William C. Rodger died at Jordan, N. Y., on January 2, 1898. At that time he was a member of the firm of Rodger & Co., which conducted a banking business in the village, and also of the firm of W. C. Rodger & Co., coal dealers. Shortly after his death the surviving partner of the firm of Rodger & Co., one Robert E. Greene, made a general assignment for the benefit of creditors of the firm assets to the defendant D. Munro Hill. About the same time the defendants C. Julia Rodger and Alfred D. Lewis were appointed administrators of the individual estate of the deceased. Mr. Homer Weston, of Syracuse, N. Y., was retained by the administrators to act as their attorney. For some years he had been the personal attorney of Mr. Hill, and after the assignment he was requested by the latter to act for him in the matters arising out of that transaction. He agreed to do so, upon the express understanding, however, that, if any question should arise in which the interests of the assignee and the administrators were antagonistic, he should appear for the latter. Some time before the death of Mr. Rodger the heirs of a Mrs. Blair had begun an action to partition certain real estate of which she died seised. Six of these heirs were infants, and Mr. Rodger was appointed their guardian. He gave the usual bonds, and on three of these bonds Mr. Hill, with others, was a surety. The action resulted in a sale, and the shares of the infants in the proceeds, in the form of six checks, were turned over to Mr. Rodger about December 23, 1897. They were made payable to his order as guardian of the several infants, and amounted to the sum of $12,445.75. One of these checks, for the sum of $2,767.94, was deposited on December 28th in the Rodger & Co. bank, either to the credit of W. C. Rodger & Co., or to the credit of one of the several other firms of which Mr. Rodger was a member. A second check was deposited in the State Bank of Syracuse to the credit of W. C. Rodger & Co., and the proceeds seem to have remained there at the time of Mr. Rodger's death. Three more of the checks, amounting to $2,767.94, $1,037.98, and $2,065.98, respectively, he sent to Syracuse by his son. They were there discounted, and there was returned to him on December 27th $5,871.90 in cash. This amount Mr. Rodger wrapped in a bundle, and laid in the safe of W. C. Rodger & Co. Among the defendants in the partition action were two adults,—Mrs. Fanny Blair and Mrs. Howe. Their checks had also been received, and had been deposited by them to their own credit in the bank of Rodger & Co. On December twenty-eighth they desired their money. They

gave Mr. Rodger, therefore, their own checks on Rodger & Co., for about $1,500 and $1,800, respectively, and in return he paid them those amounts in cash out of the $5,871.90 package. Instead of placing these checks with the balance, he deposited them to the credit of W. C. Rodger & Co., in the Rodger & Co. bank. Certain other amounts out of this same package were deposited by him to the credit of the same account, until at the time of his death there was a balance of only $2,000 in cash remaining. This subsequently was handed over to the defendant Hill. At the time of Mr. Rodger's death he personally had a credit with Rodger & Co. of $9,208.03, while the account of W. C. Rodger & Co. was overdrawn to the extent of $7,800. Both Rodger & Co. and Mr. Rodger individually were insolvent. After Mr. Rodger's death, his administrators, on behalf of the infant whose check, as has been said, was deposited with the State Bank, demanded its amount of that bank, and after some investigation it was paid to them. Subsequently, and in August, 1898, the question seems to have arisen whether or not the five infants who had not received their property were not equally entitled to receive the amount of their respective checks, less their proportion of legal expenses, from the assets of Rodger & Co. The administrators of Mr. Rodger's estate thereupon, after a demand upon the assignee, began an action to recover the sums due the several infants. The complaint set forth the facts substantially as they have been here stated, and, in addition, stated that the sixth check had been turned over to the plaintiffs' attorneys in the partition action for their services, and that the infant in whose favor it was drawn had, therefore, a claim upon the amount deposited for the others. Upon these facts it was sought to recover from Mr. Hill the $2,000 given to him individually, and from him as assignee the sum of $6,132.93, alleged to be the proceeds of these infants' property, which had gone to swell the apparent assets of the bank. This action was begun through Mr. Weston. It is apparent that the action, if successful, would relieve Mr. Hill of his liability on the guardian's bonds. This fact Mr. Weston and Mr. Lewis knew. Mr. Hill was also the brother-in-law of Mrs. Rodger. But these facts, Mr. Weston testifies, had no relation to the action. It was brought, he says, without solicitation or request on the part of Mr. Hill, and not for the purpose of relieving him from liability, but because he (Weston) was familiar with the facts, and from those facts he believed but one legal result could follow. Mr. Lewis also says that the action was brought by him independently, in good faith, and without consultation or arrangement with Mr. Hill. Mr. Hill is less definite. He probably wanted the action brought, he says, but he would not say he had anything more to do with having the action commenced than the other bondsmen. He knew the result would be to relieve him as a bondsman. He also seems at one time to have admitted that he was instrumental in having the action brought, but on the present trial says he thinks he was not. He says also he did not give any directions about bringing the action. After the demand was made upon him, however, and while the complaint was being prepared he did consult Mr. Weston on the subject, and was told that the latter could not represent him, as his interests as as-

signee were opposed to those of the administrators. After some discussion of the names of different attorneys, Mr. Weston advised him to apply to Mr. Giles B. Everson, saying that he was a capable attorney, and one who would be reasonable in his charges. Mr. Hill was not acquainted with Mr. Everson, but seems to have assented, and to have left the matter in Mr. Weston's hands. He was then served with the complaint in Mr. Weston's office. Mr. Weston thereupon telephoned Mr. Everson that he had a client for him in an important matter, and asked him if he could attend to it. Mr. Everson replied that he was busy, and thereupon Mr. Weston offered to draw, and did draw, the answer to be interposed by Mr. Hill. This answer admitted all of the allegations of the complaint, and then submitted the rights of the defendant to the judgment of the court. The answer was sent over to Mr. Everson's office, and read over by the latter. He never saw Mr. Hill until much later, but he made some inquiries of Mr. Weston as to whether the facts admitted were true or not, and whether Mr. Weston had proof to sustain the allegations of the complaint, and to both questions received satisfactory assurances. The answer was thereupon signed by him, was verified by Mr. Hill, and served upon Mr. Weston.

Upon the pleadings so framed, the issues came on for trial before Mr. Justice McLENNAN. The only proof offered was a formal stipulation of the attorneys as to the identity of the Viola Blair mentioned in the complaint with the Viola Howe who made the deposit in the Rodger & Co. bank, and as to the interest upon various sums. The attention of the court was not drawn to the fact of Mr. Hill's liability as bondsman. Judgment was thereupon directed upon this stipulation, and upon the admissions contained in the answer, in favor of the plaintiff, directing the defendant, out of the assets of Rodger & Co., to pay over to the infants the various sums alleged to be due. Such a judgment was entered, and has since been complied with.

Upon this state of facts, the plaintiffs in the present action, who are judgment creditors of Rodger & Co., claim that such judgment is, as to them, collusive and fraudulent. It was the result of untrue admissions made by Mr. Hill for the purpose of protecting himself as bondsman. In making such admissions, he was unfaithful to his duties as trustee for the creditors of Rodger & Co. The true facts were concealed from the court. They therefore ask that the judgment be set aside; that the defendants Hill, Lewis, and C. Julia Rodger, individually, and as assignee and administrators, be required to return the moneys paid over in compliance with its provisions; and that the defendant Hill be removed as assignee.

There seems to be no claim made that the complaint does not state facts sufficient to constitute a cause of action. Indeed, it could not be; for, apparently, it is well settled that the creditor of an assigned estate may himself bring suit, in aid of the assignment, to set aside a collusive or fraudulent judgment, where it is alleged either that the assignee, after demand made, has refused to sue, or that he is a party to the fraud. Spelman v. Freedman, 130 N. Y. 421, 29 N. E. 765; Bank v. Leggett, 51 N. Y. 552; Kendall v. Mellen (Sup). 13 N.

Y. Supp. 207. The defendants do urge, however, that there is no proof of fraudulent intent or collusion on the part of any of the parties to the judgment which it is here sought to set aside, or on the part of any of their attorneys. In this I think they are right. In view of all the circumstances, I have no doubt that they all acted with the utmost good faith. Further, in view of the decision of this court in the case of Blair v. Hill (Sup.) 63 N. Y. Supp. 670, and of the court of appeals in Re Holmes, 53 N. E. 1126,—both matters arising out of the transactions of Mr. Rodger,—their views of the legal aspects of the controversy between the trustee and the administrators may be correct. Still this does not quite meet the difficulty. It is undoubtedly true that the assignee, under a general assignment, in this state, is not bound to litigate every claim made against such estate. If he is satisfied of its correctness, and deems that a defense would entail useless expense, he may undoubtedly compromise or neglect to defend an action brought to enforce such claim. Coyne v. Weaver, 84 N. Y. 386. If he may neglect to defend such action, he may go further, and in his answer may admit the truth of such allegations in a complaint against him as he knows to be truly stated, and there is no reason why a court of equity may not render judgment upon such pleadings when they come before it in the same manner as would be done by it in any case. But certain other principles are at least equally well established. A trustee may not, without the knowledge of his cestui que trust, so deal with the trust estate as to gain directly or indirectly any private advantage. If he does, the latter may, when the facts come to his knowledge, avoid the transaction. This is his absolute right. It is no defense to say that the result was beneficial to him; that the act was done in good faith; that there was no evil design. The law requires a trustee to be beyond suspicion. It designs to relieve him from temptation. It aims to secure to the beneficiary his best services, unhampered by even the shade of prejudice or self-interest that might arise were his interests opposed to those of his ward. Therefore it sets its seal of disapproval upon any contract, or any act by which the private interests of the trustee are subserved at the expense of the trust estate. The court of appeals has well stated this rule in Munson v. Railroad Co., 103 N. Y. 58–73, 8 N. E. 355–358. "We are of opinion," it says, "that the contract of September 14, 1875, is repugnant to the great rule of law which invalidates all contracts made by a trustee or fiduciary, in which he is personally interested, at the election of the party he represents. * * * The law permits no one to act in such inconsistent relations. It does not stop to inquire whether the contract or transaction was fair or unfair. It stops the inquiry when the relation is disclosed, and sets aside the transaction or refuses to enforce it, at the instance of the party whom the fiduciary undertook to represent, without undertaking to deal with the question of abstract justice in the particular case. It prevents frauds by making them, as far as may be, impossible, knowing that real motives often elude the most searching inquiry; and it leaves neither to judge nor jury the right to determine, upon a consideration of its advantages or disadvantages, whether a contract made under such circumstances shall stand or fall." Pome-

roy, in his Equity Jurisprudence, at section 957, distinguishes two classes of cases. The first are those instances in which the trustee and the beneficiary consciously negotiate with each other, and there results from their dealings some conveyance or contract or gift. Here the transaction is not necessarily voidable. It may be valid. The second class includes those cases in which one party, purporting to act in his fiduciary character, deals with himself in his private and personal character, without the knowledge of his beneficiary. Such transactions are voidable at the suit of the beneficiary, and not merely presumptively or prima facie invalid. The same author, at section 1075, says:

"Absolute and most scrupulous good faith is the very essence of the trustee's obligation. The first and principal duty arising from this fiduciary relation is to act in all matters of the trust wholly for the benefit of the beneficiary. The trustee is not permitted to manage the affairs of the trust or to deal with the trust property so as to gain any advantage, directly or indirectly, for himself, beyond his lawful compensation."

Again, at section 1077, Mr. Pomeroy says that a trustee or other fiduciary owes an undivided duty to his beneficiary, and cannot place himself in any position which will subject him to conflicting duties, or expose him to the temptation of acting contrary to the best interests of his cestui que trust. The most important phase of this rule is that which forbids trustees and all other fiduciaries from dealing in their own behalf with respect to matters involved in the trust, and this prohibition operates irrespectively of the good faith or bad faith of such dealing.

Chaplin, in his work on Express Trusts and Powers, at section 193, is equally explicit. It is the duty, he says, of the trustee, in his dealings with the trust property, to look solely to the best interests of the beneficiary, and to refrain from seeking personal advantage. It is one of the great rules of law that all contracts made by a trustee or fiduciary, in which he is personally interested, are invalid at the election of the party he represents. The value of the rule lies, to a great extent, in its stubbornness and inflexibility. Its rigidity gives it one of its chief uses as a preventive or discouraging influence, because it weakens the temptation to dishonesty or unfair dealing on the part of the trustee, by vitiating, without attempt at discrimination, all transactions in which he assumes the dual character of principal and representative. The intrinsic fairness of the given transaction is immaterial.

An instance of the application of this rule is found in Elias v. Schweyer, 17 Misc. Rep. 707, 40 N. Y. Supp. 906. Here the defendant, as a trustee, in connection with another, held certain shares of stock in a corporation. Coveting the presidency, with its salary, he so manipulated this stock as, by the aid of the minority stockholders, to gain this position. Judge Pryor said:

"Not only did fidelity to his trust exact of defendant to employ the power of the stock he held to secure a corporate administration in its interest, but the same obligation forbade him, also, to assume a relation in which a motive of personal gain might operate to seduce him from his duty as trustee. * * * A stockholder in his own right may vote himself into office, because in so voting he violates no fiduciary obligation; while a trustee of stock, in

voting for himself, sets his personal interest in opposition to the interest of his trust. In the election of directors the beneficiaries of the trust were entitled to the unbiased judgment of their representative, and he had no right to subject that judgment to the sinister influence of self-interest. If it be argued," the court adds, "that the defendant voted for himself in the honest belief that he was the fittest incumbent of the office, the obvious answer is that no man is allowed to be a judge in his own cause, and that the vanity of the individual shall not corrupt the impartiality of the trustee. * * * The essential fact is conspicuous, that the defendant abused his position and power as trustee to secure an emolument at the expense of the trust estate."

In the case at bar the defendant Hill had plainly an interest adverse to that of the creditors of the assigned estate, whom he represented as trustee. As a bondsman for the guardian, who was claimed to have dissipated or lost the property of these infants, it was important for him that their loss should be made good. As representing the creditors of Rodger & Co., it was his duty to protect, so far as possible, the integrity of the assigned estate. Under the circumstances, he should not allow a judgment to be taken against himself by default without some notice to those interested. Clearly, he had still less right, by an affirmative act, to put the executors of Mr. Rodger in a position where they could obtain the judgment desired without making any proof whatever. The defendants claim that the facts upon which the judgment is based are true facts, and that their truthfulness has not been impeached in the present action. Very likely this is so, but, whether true or false, the trustee had no right to admit them in a case where such admission would inure to his own advantage, and to the disadvantage of those he represented. It may be said that such a rule is impracticable. When a verified complaint is served, the defendant must either answer or submit to default. If he answers, the answer must be verified, and must consequently concede such facts as he knows are true. But in such a case he should, at least, do this. He should submit to the court a full and complete statement of the facts showing his personal interest in the litigation, and comply with such directions in regard to notifying his beneficiaries of the pending action or safeguarding their interest in other ways as may be imposed upon him.

My attention is called to cases bearing upon the conclusiveness of adjudications, and the claim is made that the judgment, such as the one at issue, is just as conclusive and just as binding as if it had been the result of tedious and stubborn litigation. A judgment by default, or one by confession, or one entered upon the conceded facts is undoubtedly "attended with the same legal consequences as if there had been a verdict for the plaintiff. There exists no solid distinction between a title confessed and one tried and determined." Freem. Judgm. (4th Ed.) § 330; Henriques v. Yale University, 28 App. Div. 354–358, 51 N. Y. Supp. 284. In an attempt to impeach or set aside such a judgment for fraud, precisely the same rules apply as in an attempt to gain relief with regard to any judgment of the court. Yet this statement of the law would appear to have no bearing upon the matter at issue in this case. Any judgment, whether entered upon confession or after litigation, any contract, any act between the parties, may be impeached and set aside on the ground of fraud, and

that is the charge in this case. There was no fraud, as I have found, in the way of an existence of any evil intent, nor can any fraud be implied from the mere fact that the judgment rests upon conceded facts; for it has been held that, where a judgment is entered for debt justly due and owing, the fact that it was entered upon an offer to allow it, or upon concessions contained in an answer, does not render it collusive in any sense which allows another creditor to interfere. Watch Co. v. Hodenpyl, 135 N. Y. 430, 32 N. E. 239. The fraud which exists is simply that fraud which the law implies at the request of a beneficiary, because of the relation existing between the parties. It is what is known as "constructive fraud," and it is equally as available to the plaintiffs in this case as if they had proved actual ill conduct on the part of their trustee.

The defendants have cited various cases, of which Geyer v. Snyder, 140 N. Y. 394, 34 N. E. 784, is an example, where, in a transaction between a trustee and his beneficiary, the mere fact of the trust relation was held to be insufficient to show the invalidity of the transaction. These cases have no application to such a transaction as the one at bar. They come under the first class distinguished by Mr. Pomeroy. The contract or gift is not necessarily invalid, but where the trustee has, for instance, bought an interest in the trust property for an inadequate price, then the burden is thrown upon him of proving his good faith. In the case at bar the trustee was not dealing at arm's length with his beneficiary. He, without the knowledge of such beneficiary, was dealing with a third person, and by such dealing was obtaining a private advantage. When such is the case, mere proof of the transaction is sufficient to justify its repudiation, and nothing more is required. The burden of proof has been fully met.

In view of my finding that no fraud or collusion has been affirmatively shown to have existed on the part of the defendants or their attorneys, it is necessary to notice another line of authorities cited by the defendants. One of such cases is Ross v. Wood, 70 N. Y. 8. There it was held that:

"The fraud which will justify equitable interference in setting aside a judgment or decree must be actual and positive, not merely constructive. It must be fraud occurring in the concoction or procurement of the judgment or decree, which was not known to the party at the time, and for not knowing which he is not chargeable with negligence."

This rule is cited with approval in Mayor, etc., v. Brady, 115 N. Y. 599–617, 22 N. E. 237, and is repeated in other language in Ward v. Town of Southfield, 102 N. Y. 287, 6 N. E. 660. The court here say that:

"Before a regular judgment can be thus assailed, the proof should be clear and very satisfactory. It is not sufficient merely to raise a suspicion, or to show what is sometimes called 'constructive fraud,' but there must be actual fraud. There must be by one party a false and fraudulent representation or a fraudulent affirmative act, or a fraudulent concealment of a fact for the purpose of obtaining an undue and an unjust advantage of the other party, and procuring an unjust and unconscionable judgment."

It is sufficient to say that these cases are all brought between the parties to the original judgment, and their statement that constructive

fraud is not a sufficient basis for an action to set aside a judgment is not in any way applicable to a case like the present.

So far as the defendant Hill is concerned, therefore, I must find that the judgment should be set aside. A like finding is required with regard to the defendants Lewis and C. Julia Rodger. How much they, and particularly how much Mrs. Rodger, knew of the transaction, is not clearly apparent; but they were represented therein by an attorney who was acquainted at the time with all the facts, and his knowledge must be imputed to his clients. But, so far as the complaint asks for the removal of Mr. Hill as assignee, I think it should be denied. The rights of the plaintiffs will be fully protected if the judgment is set aside, if the plaintiffs Lewis and C. Julia Rodger are restrained from prosecuting further the action in which it was obtained, and if the questions as to whether the money in question rightfully belonged to the infants or belonged to the assigned estate shall be left to be determined upon the final accounting of the assignee. Findings in accordance with this opinion may be prepared, and, if not agreed upon, will be settled upon proper notice.

Ordered accordingly.